**Donald PRESS, as Trustee of Donald Press, P.C. Employees Profit Sharing Plan & Trust U/A DTD 6/27/80, individually, and on behalf of all others similarly situated, Plaintiff–Appellant,**

v.

**QUICK & REILLY, INC., U.S. Clearing Corp. and Quick & Reilly Group, Inc., Defendants–Appellees.**

**Bruce Cohen, Plaintiff,**

**Robert Strougo, Glenn Damato, Deborah Damato, Christopher P. Laurenzi, Carol Lassman, Barbara Strougo, as Trustee of the Elaine B. Patterson Irrevocable Trust, Louis I. Lieb, as Trustee of the Elaine B. Patterson Irrevocable Trust, Plaintiffs–Appellants,**

v.

**Donaldson Lufkin & Jenrette Securities Corporation, Merrill Lynch Pierce Fenner & Smith, Smith Barney, Inc., Defendants,**

**Bear Stearns & Co., Pershing Division of Donaldson Lufkin & Jenrette Securities, National Financial Services Corp., Defendants–Appellees.**

**Docket Nos. 97–9153, 97–9159.**

United States Court of Appeals, Second Circuit.

Argued May 10, 1999

Final Briefs Submitted Feb. 14, 2000

Decided July 10, 2000

Andrea B. Bierstein, Kaufman Malchman Kirby & Squire (Roger W. Kirby, on the brief), New York, NY, for Plaintiff–Appellant Donald Press.

Stuart D. Wechsler, Wechsler Harwood Halebian & Feffer (Gary P. Weinstein and Frederick W. Gerkens, III, on the brief), New York, NY, for Plaintiffs–Appellants Bruce Cohen, Robert Strougo, Glenn Damato, Deborah Damato, Christopher P. Laurenzi, Carol Lassman, Barbara Strougo and Louis I. Lieb.

Robert Pietrzak, Brown & Wood (Judith Welcom, Elizabeth Storch and Maria D. Melendez, Brown & Wood, and Stephen L. Ratner and David A. Florman, Rosenman & Colin LLP, on the brief), New York, NY, for Defendants–Appellees Quick & Reilly, Inc., U.S. Clearing Corp., Quick & Reilly Group, Inc., Bear Stearns & Co., Inc., and Pershing Division of Donaldson Lufkin & Jenrette Securities Corp.

James N. Benedict, Rogers & Wells (Mark A. Kirsch, Judith M. Reilly, James P. Masterson, on the brief), New York, NY, for Defendant–Appellee National Financial Services Corp.

Before: OAKES, SACK and SOTOMAYOR, Circuit Judges.

SOTOMAYOR, Circuit Judge:

This opinion disposes of two separate appeals, each of which requires us to determine whether the defendants-appellees (the "broker-dealer defendants" or "defendants")[1] violated Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b) (1994), and Rules 10b–5 and 10b–10 promulgated thereunder, 17 C.F.R. § 240.10b–5, –10 (1999), by failing to disclose their receipt of fees from money market funds and advisers for those funds that the defendants select for "automatic sweeps" of their customers' accounts. For the reasons that follow, we affirm the district court's judgments dismissing the complaints in both actions.

## BACKGROUND

### I. *The Complaints*

█ Plaintiffs-appellants ("plaintiffs") in the two actions are former and current clients of the broker-dealer defendants who established accounts with one or more of the broker-dealer defendants for the purpose of investing in various securities. When a client's account contains uninvested funds, the broker-dealer defendants invest the uncommitted balances in money market funds. In the brokerage industry, this practice is referred to as an "automatic sweep." Three of the broker-dealer defendants-Quick & Reilly, Inc., Bear Stearns & Company, Inc., and the Pershing Division of Donaldson Lufkin & Jenrette Securities-sweep balances into money markets funds managed by Alliance Capital: (1) the Alliance Money Reserves Fund ("AMR Fund"); (2) the Alliance Prime Portfolio Fund ("APP Fund"); and (3) the Alliance Capital Reserves Fund ("ACR Fund"). The remaining broker-dealer defendant, National Financial Services Corporation, sweeps balances into the Fidelity Daily Money Market Fund ("FDMM Fund"), which is managed by Fidelity Management & Research Company.[2] Plaintiffs allege that, while the money market funds selected by the broker-dealer defendants for automatic sweeps are among the poorest performers in the industry, the defendants nonetheless select these funds because the funds and their advisers make certain payments to defendants.

The thrust of plaintiffs' complaints is that defendants have committed securities fraud in violation of Rule 10b–5 by failing to disclose that they receive fees from the money market funds and their advisers. In support of their Rule 10b–5 claim, plaintiffs allege that the broker-dealer defendants intentionally failed to comply with

1. All of the defendants-appellees are broker-dealers except for U.S. Clearing Corp., which provides clearing services for securities transactions consummated by customers of broker-dealer defendant, Quick & Reilly, Inc., and Quick & Reilly Group, Inc., which allegedly "has the opportunity to and does control" U.S. Clearing Corp. and Quick & Reilly, Inc. because it owns all of the capital stock of those corporations. For ease of reference, we refer to U.S. Clearing Corp. and Quick & Reilly Group, Inc. at "broker-dealer defendants" or "defendants" as well.

2. The *Strougo* plaintiffs also allege that uncommitted balances of an uncertified class of plaintiffs with Bear Stearns & Co. brokerage accounts are automatically swept into the Alliance Capital Management Institutional Reserves Fund ("ACMIR Fund"). They further allege that National Financial Services Corp. executes automatic sweeps of its clients accounts into the Fidelity Capital Reserve Fund ("FCR Fund"). The district court declined to address plaintiffs' claims concerning the ACMIR Fund on the ground that the complaint "fails to attach or make allegations with respect to the [ACMIR Fund] prospectus and instead references the ACR [Fund] prospectus." *Strougo v. Bear Stearns & Co.*, No. 95 CIV. 6532(RPP), 1997 WL 458667, at *6 (S.D.N.Y. Aug.11, 1997). Similarly, the district court did not address plaintiffs' claims concerning the FCR Fund because there was no allegation that any of the plaintiffs' account balances were swept into that fund. *See id.* at *7. On appeal, the *Strougo* plaintiffs have not argued that the district court erred in failing to consider claims concerning the ACMIR Fund and FCR Fund, and, accordingly, we consider any such claims abandoned. *See Schwapp v. Town of Avon*, 118 F.3d 106, 112 (2d Cir.1997).

the disclosure requirements of Rule 10b–10, 17 C.F.R. § 240.10b–10, which requires a broker-dealer to disclose to its customers, *inter alia,* any remuneration it receives from third parties in connection with a customer transaction.[3] According to plaintiffs, defendants intentionally failed to make such disclosures in order to conceal their receipt of payments from the poorly performing money markets, and defendants therefore had a conflict of interest.[4]

Plaintiffs allege that the broker-dealer defendants failed to make adequate disclosures concerning two types of payments: (1) fees paid from the money market fund assets; and (2) fees paid by the fund advisers from their own resources (collectively "the fees").[5] The broker-dealer defendants made no disclosure whatsoever to plaintiffs regarding either type of payment. However, some information about the payments can be found in the relevant money market funds' prospectuses and Statements of Additional Information ("SAIs"), all of which are publicly filed with the Securities and Exchange Commission ("SEC").[6]

The relevant AMR Fund prospectus, dated November 1, 1995, states:

> Under a Distribution Services Agreement ...., the Fund makes payments to the Adviser at a maximum annual rate of .25 of 1% of the Fund's aggregate average daily net assets. For the fiscal year ended June 30, 1995, the Fund paid the Adviser at an annual rate of .21 of 1% of the average daily value of the Fund's net assets. *Substantially all such monies (together with significant amounts from the Adviser's own resources) are paid ... to[, among others,] broker-dealers and other financial intermediaries for their distribution assistance....*

(Emphasis added). In addition, the AMR Fund prospectus incorporates by reference a November 1, 1995 SAI, which was publicly filed with the SEC and was available upon request from Alliance Capital ("AMR SAI"). The AMR SAI discloses the total dollar amount for the fiscal year ended June 30, 1995, that was *"paid* by the Adviser and the Fund ... *to broker-dealers* and other financial intermediaries for distribution assistance." (Emphasis added).

The relevant ACR Fund Prospectus, dated September 30, 1994, is nearly identical to the AMR Fund prospectus, disclosing that the Fund pays its Adviser at a maximum annual rate of .25 of 1% of the Fund's aggregate average daily net assets and that such payments (combined with "significant amounts" from the Adviser)

---

**3.** Rule 10b–10 provides, in relevant part:

(a) Disclosure Requirement. It shall be unlawful for any broker or dealer to effect for or with an account of a customer any transaction in, or to induce the purchase or sale by such customer of, any security ... unless such broker or dealer, at or before completion of such transaction, gives or sends to such customer written notification disclosing:

. . . . .

(D) The source and amount of any other remuneration received or to be received by the broker in connection with the transaction[.]

17 C.F.R. § 240.10b–10.

**4.** These allegations also form the basis of the *Press* and *Strougo* plaintiffs' state law claims for fraud, breach of fiduciary duty, and unjust enrichment.

**5.** A money market fund is a separate legal entity whose assets are managed by a fund adviser that is compensated pursuant to a contract between the adviser and the fund. Broker-dealers that sell funds to the public may be compensated by: (1) commissions or sales loads paid by the investor; (2) payments from the fund assets, as permitted under Investment Company Act Rule 12b–1, 17 C.F.R. § 270.12b–1 (1999); and (3) payments from the fund adviser's own resources. Plaintiffs do not contend that the receipt of these payments is, of itself, improper. Rather, they maintain that the failure to disclose receipt of such payments violates the applicable disclosure requirements under Rules 10b–5 and 10b–10.

**6.** In their complaints, the plaintiffs explicitly incorporate by reference the funds' prospectuses.

are paid to broker-dealers and other financial intermediaries for their "distribution assistance." In addition, the ACR Fund prospectus incorporates by reference a September 30, 1994 SAI, which was filed with the SEC and available upon request from Alliance Capital ("ACR SAI"). Like the AMR SAI, the ACR SAI discloses the total dollar amount for the fiscal year ended June 30, 1994 that was *"paid* by the Adviser and the Fund ... *to* ... *broker-dealers* and other financial intermediaries for distribution assistance." (Emphasis added).

The relevant APP Fund prospectus, dated April 20, 1995, states:

> Under a Distribution Services Agreement ..., [the] Portfolio pays the Adviser at a maximum annual rate of .45 of 1% of the Portfolio's aggregate average daily net assets. *Substantially all such monies (together with significant amounts from the Adviser's own resources) are paid ... to[, among others,] broker-dealers and other financial intermediaries for their distribution assistance....*

(Emphasis added).

The relevant FDMM Fund prospectus, dated June 30, 1994, does not materially differ from the other prospectuses. It provides:

> The Distribution and Service Plans (the Plans) require [the Adviser] to make ... payments from its management fee, its past profits or any other source available. The maximum amount payable is currently at the annual rate of .38% of the average net assets.

The FDMM Fund prospectus further states that "Qualified Recipients [such as broker-dealers] currently are compensated ... at a maximum rate of up to .38% annually of the average net assets of the ... Market Portfolio [for] which they provide or have provided shareholder support or distribution services."

## II. *The District Court's Decisions*

On August 11, 1997, the district court (Patterson, J.) issued separate, unpublished decisions dismissing both actions pursuant to Fed.R.Civ.P. 12(b)(6). *See Press v. Quick & Reilly, Inc.,* No. 96 CIV. 4278, 1997 WL 458666 (S.D.N.Y. Aug.11, 1997); *Strougo v. Bear Stearns & Co.,* No. 95 CIV. 6532, 1997 WL 458667 (S.D.N.Y. Aug.11, 1997).

Beginning with plaintiffs' allegations that defendants did not comply with Rule 10b–10, the district court rejected the defendants' argument that Rule 10b–10 did not apply to the fees at issue. The broker-dealer defendants specifically argued that Rule 10b–10 applied only to fees calculated on a transactional basis and not to fees, such as the ones here, that are calculated on the basis of aggregate net assets invested over time. The district court rejected that argument, concluding that "[t]he language of Rule 10b–10 ... does not specify that the remuneration received must be calculated on a transactional basis, or in any other fashion, but only that it be 'in connection with the transaction.'" *Strougo,* 1997 WL 458667 at *4; *accord Press,* 1997 WL 458666 at *3. Thus, the district court found that Rule 10b–10 applied here, because, even though the fees at issue are calculated by reference to aggregate balances kept in the funds over a period of time, rather than calculated on a per-transaction basis, the fees are still "received in connection with[ ] a transaction, *i.e.,* the purchase of shares in a money market fund." *Strougo,* 1997 WL 458667 at *4; *accord Press,* 1997 WL 458666 at *3.

After finding that the fees at issue are subject to Rule 10b–10's disclosure obligations, the district court concluded that the defendants failed to comply with Rule 10b–10. In so holding, the district court relied on a 1979 No–Action letter by the SEC staff which states that so long as a fund prospectus discloses "the precise amount" or "a formula that would enable the customer to calculate the precise

amount" of sales loads and charges in connection with a transaction, the SEC staff would not recommend enforcement action under Rule 10b–10. *Strougo*, 1997 WL 458667 at *4 (quoting Investment Co. Inst., SEC No–Action Letter, [1979 Transfer Binder] Fed. Sec. L. Rep. (CCH) ¶ 82,041, at 81,655 (Apr. 18, 1979) ("1979 No–Action Letter")); *accord Press*, 1997 WL 458667 at *3. Believing that the 1979 No–Action Letter required the prospectus and SAI disclosures to "enable the customer to calculate the *precise amount* of th[e] fees," the district court found the prospectus and SAI disclosures insufficient to satisfy the broker-dealer defendants' obligations under Rule 10b–10. *Strougo*, 1997 WL 458667 at *4 (emphasis added); *accord Press*, 1997 WL 458666 at *3.

The district court then turned to the plaintiffs' Rule 10b–5 claims and found that although the broker-dealer defendants had failed to comply with Rule 10b–10's disclosure requirements, the complaints failed to state a fraud claim under Rule 10b–5. Specifically, the district court concluded that the prospectuses and SAIs provide "enough information ... to negate any inference of [defendants'] fraudulent intent with respect to the failure to disclose information ·regarding commissions or financial interests." *Press*, 1997 WL 458666 at *5; *accord Strougo*, 1997 WL 458667 at *6–7. Accordingly, the district court dismissed the federal securities law claims, declined to exercise supplemental jurisdiction over the remaining state law claims, and ordered the clerk to enter judgment in favor of the defendants.[7] *See Press*, 1997 WL 458666 at *5; *Strougo*, 1997 WL 458667 at *8.

### III.   *The SEC's Amicus Brief*

The *Press* and *Strougo* plaintiffs separately appealed from the judgments of the

district court. Their appeals were jointly argued before this Court on May 10, 1999. On October 29, 1999, the Court sent a letter to the SEC requesting that it submit an *amicus curiae* brief expressing the Commission's views "on the issues set forth in the [parties'] briefs," specifically "the distribution and advisory fee disclosure requirements" under Rule 10b–10.

On February 14, 2000, the SEC submitted identical *amicus* briefs for each appeal. The SEC stated in its *amicus* brief that, as the SEC understood the Court's request, the brief would respond to the following question:

> Whether the [prospectus and SAI] disclosures that were made about [the fee] payments failed to comply with Rule 10b–10, which requires broker-dealers to disclose the amount of remuneration they receive from third parties in connection with customer transactions.

SEC Brief at 1.

The SEC began its analysis by reciting the purpose of Rule 10b–10's disclosure requirements. The SEC stated: "In pertinent part, Rule 10b–10 requires a broker-dealer to disclose to its customers any remuneration it receives from third parties in connection with a customer transaction so that the customers are aware of the existence and extent of any conflict of interest that the broker-dealer has." SEC Brief at 9.

The SEC then stated its agreement with the district court's conclusion that Rule 10b–10 requires disclosure of fees calculated on the basis of a fund's assets, *i.e.*, the fees at issue here. The SEC focused on Rule 10b–10's language requiring disclosure of third-party remuneration "in connection with the transaction" and conclud-

---

7.   By dismissing the complaints in their entirety, the district court must have presumed that a violation of Rule 10b–10 does not, of itself, create a private cause of action. Whether a private cause of action may be brought for violations of Rule 10b–10 appears to be an open question, *see Levitin v. PaineWebber,*

*Inc.*, 933 F.Supp. 325, 329–30 (S.D.N.Y.1996), *aff'd*, 159 F.3d 698 (2d Cir.1998), *cert. denied*, 525 U.S. 1144, 119 S.Ct. 1039, 143 L.Ed.2d 47 (1999), but we need not consider the issue because, as discussed *infra*, defendants have complied with Rule 10b–10.

ed that such language "easily reaches fees like those in this case that are not calculated on a per transaction basis." SEC Brief at 17 (quoting Rule 10b–10(a)(2)(i)(D)). The SEC observed that "the fees [at issue here] plainly are 'in connection with the transaction;' without the transaction, there would be no fees." [8] *Id.* In addition, the SEC noted that limiting Rule 10b–10 to cover only per-transaction fees, as the defendants advocated, would be inconsistent with Rule 10b–10's purpose of "giv[ing] customers relevant information about conflicts of interest that third-party payments create on the part of the broker-dealers." *Id.* at 18–19. Such a limitation on Rule 10b–10's scope, the SEC concluded, would frustrate that purpose because conflicts of interest "are the same whether the amount paid is based on specific transactions, average assets invested, or any other basis, and the payments therefore should be disclosed." *Id.* at 19.

Having found that Rule 10b–10 applies to the fees at issue here, the SEC noted that although the broker-dealer defendants made no direct disclosures about the fees, defendants could rely on the disclosures in the fund prospectuses and SAIs to satisfy their Rule 10b–10 obligations. *See* SEC Brief at 24; *see also id.* at 10 ("[A]s a general principle[,] delivery of a prospectus containing sufficient disclosure can satisfy a broker-dealer's obligations under Rule 10b–10."). In support of this proposi-

tion, the SEC pointed out a footnote to the adopting release for Rule 10b–10, which states that, if information required by Rule 10b–10 is contained in a prospectus for the fund in which the customer's money is invested, a broker-dealer is not required to repeat such information in the periodic confirmation statements it sends to the customer. *See* SEC Brief at 24 (citing Securities Confirmations, Exchange Act Release No. 13508, § 1977–1978 Transfer Binder Fed. Sec. L. Rep. (CCH) ¶ 81,143, at 87,931 n. 41 (May 5, 1977)).[9]

But in evaluating the adequacy of the disclosures in the fund prospectuses and SAIs, the SEC rejected the district court's conclusion that those public filings fail to satisfy defendants' Rule 10b–10 obligations. The SEC explained that the district court erred at the outset by relying on the SEC staff's 1979 No–Action Letter.[10] According to the SEC, the 1979 No–Action Letter "was concerned solely with disclosures of charges paid by the customer." SEC Brief at 21. The SEC further explained that because payments made to broker-dealers by third parties are not charges paid by the customer, the 1979 No–Action Letter's requirement that the "precise amount" of such charges be disclosed does not apply to the fees at issue here. *See id.*

The SEC stated, moreover, that the "precise amount" requirement for disclosure of charges paid by the customer is not

---

8. The SEC also noted that its interpretation was "consistent with the traditional understanding that the phrase 'in connection with' in the federal securities laws is [to be] broadly construed." SEC Brief at 18 (stating that the phrase "must be construed ... flexibly to include deceptive practices touching the sale of securities") (quoting *United States v. Teicher*, 987 F.2d 112, 120 (2d Cir.1993)).

9. Footnote 41 to the adopting release provides, in relevant part:

  Of course, in the case of offerings registered under the Securities Act of 1933, the final prospectus delivered to the customer should generally set forth the information required by the proviso with respect to source and amount of remuneration.... In such situations the information specific in the proviso

need not be separately set forth on the confirmation.

  Exchange Act Release No. 13508, [1977–1978 Transfer Binder] Fed. Sec. L. Rep. (CCH) ¶ 81,143, at 87,931 n. 41.

10. The SEC, however, did confirm that the 1979 No–Action Letter is still in effect. The SEC explained that, although the Commission staff stated in a March 16, 1994 letter from Brandon Becker to Paul Schott Stevens, 1994 WL 13106, that it intended to withdraw the 1979 No–Action Letter, the staff subsequently changed its position "[a]s a result of its dialogue with the [mutual fund] industry [and] decided not to withdraw the earlier letter." SEC Brief at 23.

applicable to disclosure of third-party remuneration, because the purposes of the respective disclosures are fundamentally different. The SEC explained that the "precise amount" of customer charges should be disclosed "because the customer is paying those charges and must be able to determine exactly how much they are." *Id.* By contrast, the SEC reiterated that the purpose of disclosing third-party remuneration received by a broker-dealer is "to inform customers of the nature and extent of a broker-dealer's conflict of interest," and, therefore, "disclosure with precision is not necessary" with respect to those types of payments. *Id.*

The SEC next considered whether the disclosures in the fund prospectuses and SAIs satisfied defendants' Rule 10b–10 disclosure obligations. The SEC found "that under the currently applicable standards, the disclosure[s] made here ... suffice[ ] to meet Rule 10b–10's requirements."[11] *Id.* at 10.

Finally, the SEC turned to the Rule 10b–5 claims in these actions, noting that "[t]he fact that [a] disclosure satisfies Rule 10b–10 does not necessarily mean that there has been no violation of Rule 10b–5." *Id.* at 28. The SEC, however, did not address whether its conclusion that defendants complied with Rule 10b–10 had any bearing on plaintiffs' Rule 10b–5 claims here. *Id.* Rather, the SEC merely stated with respect to the claims: "In our view, the important issues are whether the omitted information is material and whether the omissions were made with scienter." *Id.* at 29. Regarding the materiality of the omissions, the SEC simply noted that "the existence of the payments and some information about them was disclosed in the prospectuses, so the issue is whether the difference between the information that was disclosed and the greater information

that plaintiffs claim should have been disclosed is material." *Id.* The SEC concluded by stating that because resolution of materiality and scienter issues "turns upon the application of established legal principles to the specific factual allegations in the complaints," and because "[t]he Commission does not ordinarily address these sorts of fact-bound issues in an *amicus* brief," the SEC would express no opinion regarding plaintiff's Rule 10b–5 claims, especially "in light of the emphasis on Rule 10b–10 issues in the Court's request." *Id.* at 30.

## DISCUSSION

■ In reviewing the district court's decision to grant defendants' motion to dismiss, we accept plaintiffs' factual allegations as true. *See Shields v. Citytrust Bancorp, Inc.,* 25 F.3d 1124, 1127 (2d Cir. 1994). In general, we will uphold a district court's dismissal of a claim only if it appears that the plaintiff can prove no set of facts upon which relief may be granted. *See id.* Our assessment of the district court's grant of defendants' motions to dismiss is governed by one further consideration: We are bound by the SEC's interpretations of its regulations in its *amicus* brief, unless they are "plainly erroneous or inconsistent with the regulation[s]." *See Auer v. Robbins,* 519 U.S. 452, 461–63, 117 S.Ct. 905, 137 L.Ed.2d 79 (1997) (citations and internal quotation marks omitted).

## I. *Rule 10b–10 Disclosure*

■ We need not labor long on plaintiffs' contention that the broker-dealer defendants failed to make adequate disclosures about the fees under Rule 10b–10, because we find that we are bound by the SEC's interpretation of its regulation, *i.e.,* that the general disclosures made by the

---

**11.** Although the AMR Fund and ACR Fund made disclosures in their prospectuses and SAIs, the APP Fund and FDMM Fund only made such disclosures in their prospectuses. Because the disclosures in all the prospectuses and SAIs are substantially the same— stating generally that broker-dealers receive remuneration—we do not view the additional SAI disclosures for the AMR Fund and ACR Fund to make any difference in the determination that those funds adequately disclosed information under Rule 10b–10.

fund prospectuses and SAIs are sufficient to satisfy the broker-dealers' duty under Rule 10b–10 to disclose third party remuneration.

First, we note that the SEC reasonably determined that Rule 10b–10 applies to the fees here, given the Rule's "in connection with the transaction" language and the expansive interpretation such language receives in the securities context. *Cf. United States v. Newman*, 664 F.2d 12, 18 (2d Cir.1981) (holding with respect to Rule 10b–5, that misappropriation of confidential information with the intent to purchase shares is a fraud "in connection with the purchase or sale of securities"). Second, we concur with the SEC's conclusion that, in light of footnote 41 to the release accompanying Rule 10b–10, defendants may rely on the fund prospectuses and other documents publicly filed with the SEC to satisfy their Rule 10b–10 disclosure obligations. We have consistently recognized that publicly filed information may be considered when evaluating a claim of securities fraud. *See Cortec Indus., Inc. v. Sum Holding, L.P.*, 949 F.2d 42, 47 (2d Cir. 1991) ("[W]hen a district court decides a motion to dismiss a complaint alleging securities fraud, it may review and consider public disclosure documents required by law to be and which actually have been filed with the SEC...."); *Kramer v. Time Warner Inc.*, 937 F.2d 767, 774 (2d Cir.1991) ("[I]t is highly impractical ... to preclude a district court from considering [documents referenced in a complaint and filed with the SEC] when faced with a motion to dismiss a securities action based on allegations of material misrepresentations or omissions."). Third, we agree with the SEC's conclusion that the 1979 No–Action Letter and its "precise amount" disclosure requirement has no bearing on the disclosure required here. The 1979 No–Action Letter concerned only sales loads and charges borne by the customer and not fees paid by third parties to broker-dealers.

Finally, although we are skeptical that the disclosures in the prospectuses and SAIs, *i.e.,* general statements that payments were made by the funds and their advisers to broker-dealers for their assistance, would actually alert an investor that *his* broker-dealer received such payments, we cannot say that the SEC's determination that Rule 10b–10 may be satisfied by these types of disclosures is plainly erroneous. Where an investor knows his uncommitted balances are automatically swept by his broker-dealer into a specific money market fund and where the prospectus for that fund reveals that the fund and its adviser pay fees to broker-dealers for their assistance, we recognize that it might be reasonable to expect an investor to piece together such information and conclude that his broker-dealer receives fees from that money market fund.

We therefore adopt the SEC's determination that no Rule 10b–10 violation occurred in this case. We now proceed to address plaintiffs' Rule 10b–5 claims in light of that determination.

## II. *Rule 10b–5 Securities Fraud*

■ Section 10(b) of the Exchange Act prohibits any person involved in the "purchase or sale of any security" from employing "any manipulative or deceptive device or contrivance in contravention of such rules and regulations" as the SEC "may prescribe." 15 U.S.C. § 78j(b). "SEC Rule 10b–5, promulgated under [Section] 10(b), makes it unlawful to make material misstatements or to omit material facts in connection with the purchase or sale of any security." *Grandon v. Merrill Lynch & Co.*, 147 F.3d 184, 188 (2d Cir. 1998). To state a cause of action under Rule 10b–5, a plaintiff must plead that: "(1) in connection with the purchase or sale of a security; (2) defendant, acting with scienter; (3) made a material misrepresentation or (where there exists a duty to speak) a material omission." *Id.* at 189; *see also Chill v. General Elec. Co.*, 101 F.3d 263, 266 (2d Cir.1996).

## A. *Scienter*

In order to plead scienter adequately, a plaintiff must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u–4(b)(2) (1994 & Supp.2000). "The scienter needed in connection with securities fraud is intent to deceive, manipulate or defraud, or knowing misconduct." *Press v. Chemical Inv. Servs. Corp.*, 166 F.3d 529, 538 (2d Cir.1999) (internal quotation marks omitted).

The district court held that the assorted disclosures in the fund prospectuses and SAIs negated any possible inference that defendants intended to deceive their customers. *See Press*, 1997 WL 458666, at *5; *Strougo*, 1997 WL 458667, at *8. Although we have found that adequate public disclosures may be dispositive of other elements of a plaintiffs' securities fraud claim, *see, e.g., Banca Cremi, S.A. v. Alex Brown & Sons, Inc.*, 132 F.3d 1017, 1031 (4th Cir.1997) (finding no reliance where public disclosures contradicted defendants' positive statements), we have never held that such disclosures may, as a matter of law, negate allegations of fraudulent intent. The district court's scienter analysis thus raises serious concerns.

We need not grapple with this thorny issue further, however, because, as discussed *infra*, the information plaintiffs claim to have been omitted by defendants is not material as a matter of law. Plaintiffs' securities fraud claims therefore fail for want of materiality.

## B. *Materiality*

■ An omission of information is material "if there is 'a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the "total mix" of information made available.' " *Acito v. IMCERA Group, Inc.*, 47 F.3d 47, 52 (2d Cir.1995) (quoting *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976)). "The 'total mix' of information may include data sent to shareholders by a company in addition to its proxy materials, as well as other information 'reasonably available to the shareholders.' " *United Paperworkers Int'l Union v. International Paper Co.*, 985 F.2d 1190, 1198 (2d Cir. 1993) (citations omitted).

■ Here, plaintiffs contend that knowledge that their broker-dealers have a conflict of interest, *i.e.*, that their broker-dealers are paid by the money market funds the broker-dealers selected for "automatic sweeps" of plaintiffs' uncommitted account balances, is material. We agree. *See Chasins v. Smith, Barney & Co.*, 438 F.2d 1167, 1172 (2d Cir.1970) ("[F]ailure to inform the customer fully of its possible conflict of interest, in that it was a market maker in the securities which it strongly recommended for purchase by [plaintiff], was an omission of material fact in violation of Rule 10b–5."); *see also Gary Plastic Packaging Corp. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 756 F.2d 230, 242 (2d Cir.1985) ("Commissions that defendants receive on the CDs they sell to the public are relevant and must be disclosed."). However, because we have adopted the SEC's conclusion that the defendants' Rule 10b–10 obligation to disclose third-party remuneration are satisfied by the general disclosures made in the fund prospectuses and SAIs, we cannot agree that the broker-dealer defendants omitted material information regarding their conflict of interest under Rule 10b–5.

Our holding that defendants did not omit material information because defendants were in compliance with Rule 10b–10 is not entirely free of tension. As the SEC noted in its *amicus* brief, Rule 10b–5 materiality in this case ought to boil down to "whether the difference between the [Rule 10b–10] information that was disclosed and the greater information that plaintiffs claim should have been disclosed is material." SEC Brief at 29. The "greater information" here–an explicit

statement that an investor's broker-dealer is among the broker-dealers receiving such fees-seems likely to be important to an investor who did not understand the general disclosures in the fund prospectuses or SAIs to convey such information. *Cf. TSC Indus.*, 426 U.S. at 449, 96 S.Ct. 2126 (holding that information is material if it would alter the "total mix of information" in the mind of a reasonable investor).

Moreover, we are well aware that the Preliminary Note to Rule 10b–10 states that "[t]he requirements under this section that particular information be disclosed is not determinative of a broker-dealer's obligation under the general antifraud provisions of [Rule 10b–5]." 17 C.F.R. § 240.10b–10 Preliminary Note. The release accompanying the enactment of the Preliminary Note further explains that the note is meant to clarify that Rule 10b–10 "is not intended as a safe harbor from disclosure obligations imposed by the general antifraud provisions of the federal securities laws." Confirmations of Transactions, Exchange Act Release No. 34962, (1994–1995 Transfer Binder Fed. Sec. L. Rep. (CCH) ¶ 85,455, at 85–940 (Nov. 10, 1994)). The release also states that "[t]he preliminary note is merely making explicit a longstanding position that the antifraud provisions of the federal securities law may impose, given the circumstances, greater than what may be required by a specific rule or regulation." *Id.* at 85,941.

Despite these considerations favoring a finding of materiality here, we believe such a finding would supplant the SEC's determination of what is material with our own. This conclusion rests on the crucial common ground between the purpose of Rule 10b–10 and the reason plaintiffs claim additional disclosure was necessary under Rule 10b–5—disclosure of a broker-dealer's conflict of interest created by the receipt of remuneration from third-parties.

By concluding that the disclosures in the fund prospectuses and SAIs were sufficient to satisfy defendant's disclosure obligations under Rule 10b–10, *see* Brief at 11–12, the SEC must have determined, as a policy matter, that the broker-dealer defendants' conflict of interest was sufficiently disclosed to plaintiffs. The SEC emphasized repeatedly that "the purpose of Rule 10b–10 ... is to give customers relevant information about conflicts of interest that third-party payments create on the part of the broker-dealers." SEC Brief at 18–19; *see also id.* at 9 ("Rule 10b–10 requires a broker-dealer to disclose to its customers any remuneration it receives from third parties in connection with a customer transaction *so that the customers are aware of the existence and extent of any conflict of interest that the broker-dealer has.*") (emphasis added); *id.* at 14–15 ("In the adopting release for Rule 10b–10, the Commission explained that disclosure of third-party remuneration is necessary because when a broker-dealer both acts as a customer's agent and receives payments from others, the situation 'presents a potential for abuse since there is a prima facie problem in representing fairly the rights of parties having conflicting interests.'" (quoting Exchange Release No. 13508, [1977–1978 Transfer Binder] Fed. Sec. L. Rep. (CCH) ¶ 81,143, at 87,927)).

Thus, in concluding that defendants were in compliance with Rule 10b–10, the SEC necessarily concluded that the general disclosures in the prospectuses and SAIs achieve the purpose of Rule 10b–10, *i.e.*, adequate disclosure of the broker-dealer defendants' conflict of interest. That purpose is exactly the purpose for which plaintiffs argue that "greater disclosure" under Rule 10b–5 is necessary. Therefore, because the SEC has decided precisely what type of disclosure is necessary to reveal a conflict of interest arising from third-party payments to broker-dealers in the context of Rule 10b–10, we will not undermine the SEC's interpretation of its regulation by requiring even greater disclosure about that conflict of interest under the general antifraud provisions of Rule 10b–5. Accordingly, we are compelled to conclude that additional disclo-

sure beyond what the fund prospectuses and SAIs reveal is not, as a matter of law, material.[12]

For the foregoing reasons, we hold that defendants' compliance with Rule 10b–10 renders the allegedly omitted information immaterial as a matter of law. Although we are not ourselves certain that the disclosure requirements under Rule 10b–10 fulfil its stated purpose, we defer to the SEC's interpretation of its rule and leave it to the governmental entity best suited to sort out any inadequacies of the current disclosure regime.[13]

## CONCLUSION

Because we find that the information defendants allegedly omitted is not, as a matter of law, material under Rule 10b–5, plaintiffs' securities fraud claims must fail.

Accordingly, we affirm the district court's judgment dismissing plaintiffs' complaints.

**12.** We believe that this result is entirely consistent with the Preliminary Note to Rule 10b–10, because the disclosure requirements of Rule 10b–5 still apply to those categories of information not specifically covered by Rule 10b–10. We do not view the Preliminary Note as allowing Rule 10b–5 claims seeking additional disclosure with respect to information already contemplated by Rule 10b–10, because such an interpretation would render Rule 10b–10's disclosure requirements meaningless. The few cases stating that Rule 10b–10 compliance will not save a broker-dealer from a Rule 10b–5 claim also support our interpretation of the Preliminary Note. In *Ettinger v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 835 F.2d 1031, 1036 (3d Cir. 1987), the court announced that "a broker-dealer's compliance with the disclosure requirements of Rule 10b–10 does not, as a matter of law, shield it from possible liability under Rule 10b–5." The *Ettinger* defendants, however, were in "compliance" with Rule 10b–10 because the transactions at issue were not subject to the disclosure requirements of Rule 10b–10. The court thus rejected the defendants' contention that simply because "the SEC specifically considered and rejected various proposals that would have brought the transactions at issue … under the … disclosure requirements of Rule 10b–10," the SEC must have intended to eliminate Rule 10b–5 liability for those types of transactions. *Id.* at 1035. Similarly, in *Krome v. Merrill Lynch & Co.*, 637 F.Supp. 910 (S.D.N.Y.1986),

defendants were in "compliance" with Rule 10b–10 because the rule did not apply to their transactions. Thus, the court found that "even though defendants did not violate Rule 10b–10, they may still be subject to liability under Rule 10b–5" for failing to make adequate disclosure concerning those transactions. *Id.* at 916.

**13.** The SEC also appears to recognize our concern. In its *amicus* brief, the SEC notes that "a broker-dealer customer that has invested in a fund typically cannot tell from the prospectus whether *his* broker-dealer received any such payments, or the amount actually paid to broker-dealers rather than to other intermediaries or spent by the adviser itself." SEC Brief at 26 (emphasis in original). Despite its apparent recognition that current disclosure requirements of Rule 10b–10 might not serve their intended purpose, the SEC concludes in the subsequent sentence that "[n]onetheless, the Commission believes that [plaintiffs'] disclosure of the information about [the fees] … is sufficient to satisfy the requirements of Rule 10b–10." SEC Brief at 26. Seemingly aware that Rule 10b–10 might not require adequate disclosure "as a matter of policy" in its existing state, the SEC volunteered that "[t]he Commission has directed [its] staff to make recommendations … as to whether additional disclosure should be required or current disclosure further refined" under Rule 10b–10. SEC Brief at 24 & n. 9.