23-7876 (L)
*Alta Partners, LLC et al. v. Getty Images Holdings, Inc.*

UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

---

August Term 2024

(Argued:  January 22, 2025      Decided: January 15, 2026)

Docket Nos. 23-7876 (L), 23-7915 (Con), 23-7983 (XAP)

---

ALTA PARTNERS, LLC,
*Plaintiff-Appellee-Cross-Appellant,*

CRCM INSTITUTIONAL MASTER FUND (BVI) LTD.,
CRCM SPAC OPPORTUNITY FUND LP,
*Plaintiffs-Appellees,*

*v.*

GETTY IMAGES HOLDINGS, INC.,
*Defendant-Appellant-Cross-Appellee.*[*]

---

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

---

Before:      KEARSE, CHIN, and MENASHI, *Circuit Judges*.

---

[*]      The Clerk of Court is respectfully directed to amend the official caption as set forth above.

Consolidated cross-appeals from two judgments of the United States District Court for the Southern District of New York (Rakoff, *J.*), awarding damages to plaintiffs-appellees warrant holders on their breach of contract claims against defendant-appellant media company. The warrant holders sought to exercise their warrants to purchase the media company's stock, but the media company refused to honor the redemption requests. The warrant holders sued, alleging that the media company breached its obligations under the applicable warrant agreement. The district court granted summary judgment in favor of the warrant holders, holding as a matter of law that the conditions of the warrant agreement had been met. The district court also limited the recovery of one of the warrant holders, ruling that it could not recover for warrants it purchased after the media company rejected its redemption request.

AFFIRMED.

Judge Menashi dissents in a separate opinion.

---

WILLIAM SAVITT, Wachtell, Lipton, Rosen & Katz, New York, NY, *for Plaintiffs-Appellees*.

JUSTIN M. SHER (Max Tanner, *on the brief*), Sher Tremonte LLP, New York, NY, *for Plaintiff-Appellee-Cross-Appellant*.

2

SHAY DVORETZKY (Parker Rider-Longmaid, Susan Saltzstein, Scott Musoff, Jeremy Patashnik, Nicole Welindt, *on the brief*), Skadden, Arps, Slate, Meagher & Flom LLP, Washington, DC, New York, NY, and Palo Alto, CA; and John A. Neuwirth, *on the brief*, Weil, Gotshal & Manges LLP, New York, NY, *for Defendant-Appellant-Cross-Appellee*.

CHIN, *Circuit Judge*:

In these consolidated cases, plaintiffs-appellees Alta Partners, LLC ("Alta") and CRCM Institutional Master Fund (BVI) Ltd. and CRCM SPAC Opportunity Fund LP (together, "CRCM") acquired warrants to purchase stock of defendant-appellant Getty Images Holdings, Inc. ("Getty"). When Alta and CRCM sought to exercise the warrants, Getty refused the requests, contending that the conditions in the warrant agreement for the exercise of the warrants had not been met. Alta and CRCM brought these actions below, alleging that the conditions had been met and asserting breach of contract claims.

The district court granted summary judgment in favor of Alta and CRCM, concluding as a matter of law that the conditions for the exercise of the warrants had been met. The district court awarded damages to Alta and CRCM, but limited the amount awarded to Alta.

3

On appeal, Getty argues that the district court erred in granting summary judgment against it, and Alta argues that the district court erred in not awarding it additional damages. We affirm in both respects.

## BACKGROUND

### I. *The Facts*[1]

Getty is a "global visual content creator and marketplace" that went public in July 2022 by merging with CC Neuberger Principal Holdings II ("CCNB"), a special purpose acquisition company ("SPAC"). App'x at 50 ¶ 26. CCNB had become a public company about two years earlier through an initial public offering ("IPO") on the New York Stock Exchange ("NYSE") on August 4, 2020. Through its IPO, CCNB sold 82.8 million "units" at a price of $10 each. The "units" consisted of (1) one class A share of CCNB common stock and (2) one-fourth of one CCNB public warrant. Following the IPO, the units were separable into publicly tradable CCNB warrants and shares. Each public warrant entitled the warrant holder to purchase one common share of CCNB stock at a price of $11.50 for a period of up to five years. Alta and CRCM each purchased millions

---

[1] The following facts are drawn from the summary judgment record. In reviewing cross-motions for summary judgment, we draw "all reasonable factual inferences in favor of the party against which judgment was granted." *Chandok v. Klessig*, 632 F.3d 803, 812 (2d Cir. 2011).

of publicly tradeable CCNB warrants, which were governed by a warrant agreement (the "Warrant Agreement"). Alta and CRCM are third-party beneficiaries of the Warrant Agreement.

The Warrant Agreement provided that the warrants would be exercisable starting on "the date that is thirty days after the first date on which [CCNB] completes a merger . . . or similar business combination," App'x at 25; *see also id.* at 2736 ¶ 16, if two conditions were met: (1) "a registration statement under the Securities Act with respect to the Ordinary Shares underlying the Public Warrants [was] then effective,"[2] and (2) "a prospectus relating thereto [was] current," *id.* at 2737 ¶ 17.

To ensure the conditions would be satisfied, the Warrant Agreement imposed additional requirements on CCNB. It required CCNB to use commercially reasonable efforts to file with the Securities and Exchange Commission (the "SEC") a registration statement for the registration, under the Securities Act, of the Ordinary Shares issuable upon exercise of the public warrants. The registration statement was to be filed as soon as practicable, but no later than twenty business days after the close of the merger. CCNB was also

---

[2]    The "Ordinary Shares" consisted of the New CCNB/Getty Images "Class A Common Stock underlying the public warrants." App'x at 229.

required to "use commercially reasonable efforts to cause" the registration statement "to become effective" within sixty business days after the closing of the merger "and to maintain a current prospectus relating thereto." *Id.* at 2738 ¶ 21.

CCNB (and later, "New CCNB," otherwise known as Getty after it went public) filed two registration statements with the SEC that are relevant to this appeal -- a Form S-4 and a Form S-1. CCNB filed the Form S-4 on January 18, 2022. The S-4 listed the five classes of securities that were being registered, including 39,260,000 "Warrants to purchase common stock" and 39,260,000 "Class A Common stock underlying warrants." App'x at 229. CCNB filed an amended S-4 on June 27, 2022, which included an opinion from counsel. The opinion stated it was "being rendered in connection with the registration under the above-referenced Registration Statement of . . . 39,260,000 New CCNB Warrants and . . . 39,260,000 Warrant Shares." *Id.* at 2361. The Form S-4 also included an 800-page prospectus, which covered all the securities listed on the form and provided information on pro forma financials, Getty's post-closing capital structure, and the proceeds Getty could receive from warrant exercise. *See Alta Partners, LLC v. Getty Images Holdings, Inc.*, 700 F. Supp. 3d 32, 44 (S.D.N.Y. 2023). The SEC declared the S-4 effective on June 30, 2022.

The business combination between CCNB and then-privately-held Getty closed on July 22, 2022. The surviving entity, "New CCNB," subsequently changed its name to "Getty Images Holdings, Inc.," and became a publicly-traded company. App'x at 2744 ¶ 42. Getty then assumed all of CCNB's rights, liabilities, and obligations under the Warrant Agreement. Accordingly, once the warrants issued by CCNB became exercisable, they would no longer be redeemed for CCNB shares; instead, they would be redeemed for Getty shares.

Prior to the close of the merger, CCNB shareholders had the option to have their CCNB shares redeemed for $10 each or converted into Getty Images shares. Some 99.4% of the shareholders opted to take the cash. Thus, after the merger closed, there were only 508,311 Getty shares held by the public and available for trading. The number of publicly available shares had diminished because of the redemptions for cash, and many other outstanding shares were, at that time, restricted.

On August 9, 2022, Getty filed the second registration statement on a Form S-1. The S-1 registered new Getty securities -- 400,795,769 Class A Common Stock shares and 3,750,000 warrants to purchase Class A Common Stock -- that had not been previously registered. Notably, however, the S-1 listed

39,260,000 "Class A Common Stock underlying Warrants" as "Previously Registered" on the Form S-4, with an "Initial Effective Date" of June 30, 2022. *Id.* at 991. On the next page, the Form S-1 declared that "[n]o registration fee is payable in connection with the 39,260,000 shares of Class A Common Stock previously registered [on the Form S-4 registration statement] . . . because such shares are being transferred from the Prior Registration pursuant to Rule 429(b) under the Securities Act." *Id.* at 992. It further noted that:

> Pursuant to Rule 429(b) under the Securities Act, this registration statement upon effectiveness, will constitute post-effective amendments to the Prior Registration Statement . . . . If securities previously registered under the Prior Registration Statement are offered and sold before the effective date of this registration statement, the amount of previously registered securities so sold will not be included in the prospectus hereunder.

*Id.* The Form S-1 was accompanied by a new prospectus. The new prospectus disclosed that 99.4% of CCNB shareholders had their CCNB shares redeemed for cash ahead of the merger, an additional quarter of financial statements for Q2 2022, pro forma financial statements disclosing changes to Getty's capital structure, and tax consequences of buying, owning, or selling Getty shares and warrants.

8

In its earlier Form S-4, Getty had informed investors about the financial impact of various redemption scenarios on the company's capital structure. Getty had also disclosed the 99.4% cash redemption rate in its Form 8-K on July 28, 2022, and its Q2 2022 results on a Form 10-Q on August 12, 2022. CCNB had also provided a similar disclosure regarding the tax consequences of buying, owning, and selling warrants in its Form S-1 two years earlier. The S-1 was declared effective after the market closed on September 15, 2022.

Getty's stock price rose considerably in the weeks following the July 22 merger. Between July 29 and August 26, 2022, the trading price of Getty stock closed at an average price of $29.00 per share and traded within a range of $24.93 to $33.93 -- well above the $11.50 exercise price of the warrants. On August 22, 2022, Getty's stock opened at approximately $30.63. It opened at $28.00 on August 23, 2022, and closed at $29.05 on August 24, 2022. By this time, CRCM held 3,010,764 public warrants. Alta held 2,066,371 warrants. CRCM attempted to exercise all its warrants on August 22 and 23, 2022. Alta attempted to exercise its warrants on August 24, 2022. But on August 24, 2022, Getty refused and informed Alta that the warrants would not be exercisable until the Form S-1 became effective. Getty informed CRCM of the same on August 25, 2022.

9

Meanwhile, Getty insiders -- eligible former legacy Getty equity holders -- significantly benefited from Getty's increased stock trading price. By August 25, 2022, Getty shares had been trading above $17.50 for 20 consecutive trading days. This triggered a provision in the business combination agreement that entitled various Getty insiders to receive additional "earnout" shares of Getty stock. All told, Getty issued 59 million shares to these individuals.

Shortly thereafter, Getty's stock price began declining. CRCM sold most of its warrants at prices ranging from $.48 to $1.24. Alta, on the other hand, continued to purchase 11,593,149 additional warrants between August 25 and September 6, 2022. Some 1,147,714 of these warrants were purchased directly from Getty. Alta acquired the remaining warrants on the NYSE from previous warrant holders.

Getty permitted the warrants to be exercised beginning on September 16, the day after the SEC declared the S-1 effective. By this time, however, Getty's stock price had dramatically declined. The day after the S-1 went into effect, which registered an additional 400.8 million shares, the stock price opened at $11.25 and closed at $8.49 per share -- well below the $11.50 warrant exercise price. On September 19, Getty declared that it was invoking a

provision of the Warrant Agreement that permitted Getty, at its option, to unilaterally redeem the warrants for only $0.01 each.[3]  As a result, Alta was forced to redeem all its remaining warrants for a penny each.

## II.     *Proceedings Below*

On October 19, 2022, Alta sued Getty for breach of the Warrant Agreement as well as breach of the implied covenant of good faith and fair dealing.  Alta also asserted a claim under Section 11 of the Securities Act for the filing of a materially misleading registration statement.  *See Alta Partners, LLC v. Getty Images Holdings, Inc.*, No. 22-cv-8916-JSR ("*Alta Action*"), Dkt. No. 1.  CRCM filed a similar suit on February 8, 2023.  *See CRCM Institutional Master Fund (BVI) Ltd. et al v. Getty Images Holdings, Inc.*, No. 23-cv-1074-JSR ("*CRCM Action*"), Dkt. No. 1.  The court consolidated the actions through discovery with the consent of the parties.

On October 26, 2023, the court granted summary judgment in favor of Alta and CRCM on their breach of contract claims.  The district court

---

[3]     The provision permitted Getty to force the redemption of warrants for a penny each "provided that the last reported sales price of the Ordinary Shares reported has been at least $18.00 per share . . . on each of twenty trading days within the thirty-trading day period ending on the third Business Day prior to the date on which notice of the redemption is given."  App'x at 31 (emphasis omitted).

11

concluded that both conditions for warrant exercise were satisfied. Specifically, the court found that the Form S-4 constituted an effective registration statement for the issuance of Getty shares underlying the public warrants, and the prospectus filed with the Form S-4 was still current at the time that CRCM and Alta sought to exercise their warrants. The district court also concluded that CRCM was entitled to $50,967,348 and Alta to $36,946,713 in damages for Getty's breach (excluding interest). The court, however, declined to award additional damages to Alta for warrants that it purchased after August 24, 2022, that is, after Getty had advised Alta that it was not redeeming the warrants. Summary judgment was granted to Getty on the remaining claims.[4]

These cross-appeals followed.

### DISCUSSION

"We review a district court's grant of summary judgment *de novo*, construing the evidence in the light most favorable to the non-moving party and drawing all reasonable inferences in its favor." *Dish Network Corp. v. Ace Am. Ins. Co.*, 21 F.4th 207, 212 (2d Cir. 2021) (quoting *Fed. Ins. Co. v. Am. Home Assurance Co.*, 639 F.3d 557, 566 (2d Cir. 2011)). "Summary judgment is appropriate where

---

[4] Alta and CRCM do not challenge the district court's dismissal of these additional claims.

there exists no genuine issue of material fact and, based on the undisputed facts, the moving party is entitled to judgment as a matter of law." *Id.* (quoting *Fed. Ins. Co.*, 639 F.3d at 566). "When both parties have moved for summary judgment, 'the court must evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration.'" *Id.* (quoting *Coutard v. Mun. Credit Union*, 848 F.3d 102, 114 (2d Cir. 2017)); *see also Chandok v. Klessig*, 632 F.3d 803, 812 (2d Cir. 2011).

We begin with Getty's arguments on appeal and then turn to Alta's cross-appeal.

## I. Getty's Appeal

Getty advances two main arguments on appeal. First, Getty argues that the district court erred in ruling that it breached the Warrant Agreement because the two required conditions for exercise under the contract had not been met. In particular, Getty contends that there was no effective registration statement for the issuance and sale of the warrant shares until the S-1 was declared effective in September 2022, and the prospectus relating to the shares was not current at the time Alta and CRCM sought to exercise their warrants. Second, Getty argues that even if it was in breach of the agreement, the district

13

court erred in finding no issues of material fact as to the amount of damages owed to Alta and CRCM.

For the reasons set forth below, we are not persuaded by either argument. We conclude that the Form S-4 registered the underlying shares issuable upon exercise of the public warrants, and the prospectus, filed in conjunction with the Form S-4, was current at the time of Alta and CRCM's requests to exercise their warrants. We also conclude that the district court correctly based the damages award on the stock price of the warrant shares on the date of Getty's breach.

### a. *The Registration Statement*

We start with the registration statement. "A registration statement shall be deemed effective only as to the securities specified therein as proposed to be offered." 15 U.S.C. § 77f(a). In other words, "[a] registration statement permits an issuer, or other persons, to make only the offers and sales described in the registration statement." S*EC. v. Cavanagh*, 155 F.3d 129, 133 (2d Cir. 1998). A single registration statement may, of course, be used to register both the offer and sale of a class of securities. *See id.* ("A registration statement permits an issuer, or other persons, to make . . . the offers and sales described in the

14

registration statement."); Thomas Lee Hazen, *Treatise on the L. of Secs. Regul.*, Section §§ 2:12, 2:16 (2023) (observing that the registration process is divided into three parts using the same registration statement). Under Section 5 of the Securities Act of 1933, however, a person may not *offer to sell* a security unless a registration statement is filed, and may not *sell* that security until the registration statement is declared effective. *See Cavanagh*, 155 F.3d at 132-33.

The parties' dispute centers on whether the Form S-4, filed by CCNB on January 18, 2022, and declared effective by the SEC on June 30, 2022, was an effective registration statement for the purpose of redeeming the warrants. Getty concedes on appeal that the S-4 registered the shares underlying the warrants but maintains that it only registered the *offer* of those shares, not their issuance or sale. According to Getty, it "could not register the issuance or sale of warrant shares on the Form S-4 because no warrant shares would be issued in the Business Combination" -- "the de-SPAC transaction by which Getty Images became a public company." Appellant Br. xi, 32-33 (emphasis omitted). Getty asserts that a separate registration statement -- in this case, the Form S-1 -- was required to register the issuance and sale of these shares. Construing the facts

below in the light most favorable to Getty, we hold that the district court correctly rejected this argument.

We first look to the text of the Warrant Agreement to determine what was required for an effective registration statement. A "written agreement that is complete, clear and unambiguous on its face must be enforced according to the clear meaning of its terms." *See UBS Fin. Servs. Inc. v. W. Va. Univ Hosps., Inc.*, 660 F.3d 643, 649 (2d Cir. 2011) (quoting *Greenfield v. Philles Recs., Inc.*, 98 N.Y.2d 562, 569 (2002)). As an initial matter, the Warrant Agreement does not specify whether the registration statement must be made on a particular form, *e.g.*, a Form S-4 or a Form S-1. Nor does it suggest that two separate registrations will be required before the warrants can be exercised. Section 3.3.2 simply requires there to be an "effective" "registration statement under the Securities Act [of 1933] *with respect to*" the shares underlying the warrants. App'x at 26 (emphasis added).

While the phrase "with respect to" is broad, section 7.4.1 of the Agreement offers additional context as to the type of statement that would satisfy this condition. It provides that "as soon as practicable, but in no event later than twenty . . . [b]usiness [d]ays after the . . . [merger], [Getty] shall use

16

commercially reasonable efforts to file . . . a registration statement for the registration, under the Securities Act, of the Ordinary Shares *issuable upon exercise of the Warrants*." *Id.* at 33 (emphasis added). Read together, we conclude that these provisions provide that an effective registration statement "with respect to" the underlying shares means "a registration statement" of the warrant shares that would be sold and issued upon exercise of the warrants.

Turning to Form S-4, we conclude as a matter of law that it satisfies this criterion. It registered the warrant shares that would be issued upon exercise of the warrants, and there was no need to file a separate registration statement to permit those warrants to be exercised. The S-4 states that it is registering the 39,260,000 "Warrants to purchase common stock" as well as 39,260,000 "Class A Common stock *underlying warrants*, which "[r]epresent 39,260,000 shares of New CCNB [Getty] Class A Common Stock, *issuable upon exercise* by holders of New CCNB [Getty] Warrants following the completion of the [merger]." *Id.* at 229-330 (emphasis added). Significantly, the "issuable upon exercise" language in the Form S-4 is identical to the language in section 7.4.1 of the Warrant Agreement described above, which required Getty to file a registration statement of the shares "issuable upon exercise of the Warrants." *Id.*

at 33. In other words, the S-4 achieved what section 7.4.1 of the Warrant Agreement mandated -- the filing of a registration statement for the warrant shares issuable upon exercise of the warrants.[5]

While Getty asserts that the Form S-1 was the only effective registration statement for the issuance of the warrant shares, everything on the S-1 actually indicates that the underlying warrant shares had already been registered on the Form S-4. For example, the Form S-1 lists 39,260,000 Class A Common Stock underlying Warrants as "*Previously Registered*" on the Form S-4, with an "Initial Effective Date" of June 30, 2022. *Id.* at 991 (emphasis added); *id.* at 2475-76. The S-1 also declares that "[n]o registration fee is payable in connection with the 39,260,000 shares of Class A Common Stock *previously registered* on a registration statement on Form S-4 . . . because such shares are being transferred from the Prior Registration pursuant to Rule 429(b) under the Securities Act." *Id.*at 992 (emphasis added). Finally, the S-1 states that "[i]f securities previously registered under the Prior Registration Statement are *offered* and *sold* before the

---

[5]  CCNB's own legal counsel confirmed as much. On June 27, 2022, CCNB filed an amended S-4. The amended S-4 was accompanied by a counsel opinion letter, which stated that it was "being rendered in connection with the registration under the above-referenced Registration Statement of . . . 39,260,000 New CCNB Warrants and . . . 39,260,000 Warrant Shares." App'x at 2361.

18

effective date of this registration statement, the amount of previously registered securities so sold will not be included in the prospectus hereunder." *Id.* at 992 (emphasis added). Thus, the S-1 not only declared that the warrant shares were previously registered on the Form S-4, but also contemplated that the shares could be sold prior to the effective date of the Form S-1.

Securities law and regulations support our reading of the registration statements in this case. A Form S-4 may be used for the offering of securities pursuant to Rule 415(1)(viii). *See* Form S-4, Registration Statement under the Securities Act of 1933, Instruction H, https://www.sec.gov/files/forms-4.pdf [https://perma.cc/GTF3-G6L3]. Rule 415(1)(viii), in turn, permits securities to "be registered for an offering to be made on a continuous or delayed basis in the future" if "[t]he registration statement pertains only to . . . [s]ecurities which are to be issued in connection with business combination transactions." 17 C.F.R. § 230.415(a)(1)(viii) (2024). Here, the district court correctly found as a matter of law that the de-SPAC process that created the publicly-traded Getty Images was a "business combination" and that the securities registered on the Form S-4 were registered "in connection with" that business combination. The warrants could only be exercised, and the warrant shares issued, after the business combination

19

closed.  *See Merrill Lynch, Pierce, Fenner &Smith Inc. v. Dabit*, 547 U.S. 71, 85 (2006) (noting that the phrase "in connection with" is to be construed broadly in securities law).  The warrants and warrant shares were therefore appropriately registered on the Form S-4.  Accordingly, there was no need to register these securities on a Form S-1, which is to be used to register securities when "no other form is authorized or prescribed."  Form S-1, Registration Statement under the Securities Act of 1933, Instruction I, https://www.sec.gov/files/forms-1.pdf [https://perma.cc/D9JC-6VAS].

Moreover, according to the SEC's own guidance, issuers such as Getty *must* register the warrants and underlying warrant shares at the same time when the "securities are . . . exercisable within one year."  U.S. Sec. & Exchange Comm'n, C & DI 139.01 Section 139, Securities Act Section 5, Question 139.01 (2009).  As the SEC explains, "[b]ecause the securities are convertible or exercisable within one year, an offering of both the overlying security and underlying security is deemed to be taking place."  *Id.*  The Getty warrants here, which were exercisable within 30 days of the completed merger, were certainly "exercisable within one year" and thus needed to be registered at the same time

as the stock underlying the warrants. Notably, the SEC's guidance does not state that a second registration is required to allow the actual exercise of the warrants.

Finally, we reject Getty's alternative argument that even if the Form S-4 properly registered the warrant shares, the sale of these shares was suspended from August 9, 2022, when the combined prospectus was filed with the Form S-1, until September 15, 2022, when the Form S-1 was declared effective. Getty failed to make this argument to the district court below. Getty's argument at summary judgment focused entirely on whether the new prospectus, filed with the Form S-1, materially altered the mix of information available to investors. That is meaningfully different from Getty's argument on appeal, which concerns the impact of a combined prospectus through Rule 429 on an earlier registration statement. We therefore review only for fundamental error and we do not find any grounds for vacatur.

Rule 429 provides that "[w]here a registrant has filed two or more registration statements, it may file a single prospectus in the latest registration statement" and "the registration statement containing the combined prospectus shall act, *upon effectiveness*, as a post-effective amendment to any earlier registration statement whose prospectus has been combined in the latest

registration statement."  17 C.F.R. § 230.429 (2025) (emphasis added).  The SEC

has explained that "[o]nce Rule 429 is used to create a combined prospectus, the

prospectus that is a part of the earlier registration statement generally may not be

used by itself."  U.S. Sec. & Exchange Comm'n, C & DI Section 225, Rule 429 --

Prospectus Relating to Several Registration Statements, Question 225.01 (2009).

When Getty filed its Form S-1 on August 9, it used Rule 429 to create a combined

prospectus.  That combined prospectus acted as a post-effective amendment to

the Form S-4.  The text of Rule 429, however, makes clear that a combined

prospectus does not operate as a post-effective amendment to any earlier

registration statement until *after* it is declared effective.  *See* 17 C.F.R. § 230.429

(2025).  That did not occur here until September 15, well after the dates that

CRCM and Alta attempted to exercise their warrants a month earlier.

To the extent there is any ambiguity about the operation of Rule 429

in these circumstances, this only lends further support to our conclusion that any

error below was not fundamental.  *See Salamone v. Douglas Marine Corp.*, 111 F.4th

221, 233 (2d Cir. 2024) ("The fundamental-error standard, applied in civil cases, is

akin to the plain error standard applicable to criminal cases, see Fed. R. Crim. P.

52(b), but is even more stringent . . . .  In order to warrant relief, such a

22

fundamental error must be even more egregious than the type of plain errors that might suffice to excuse a procedural default in a criminal trial.") (citation modified).  Accordingly, we hold that the S-4 was an effective registration statement with respect to the issuance and sale of the warrant shares.

**b.** *The Prospectus*

We conclude as well that the second required condition for exercise, a "current" "prospectus relating" to the warrant shares, was also satisfied on the dates of Alta and CRCM's attempted exercise of the warrants.  App'x at 2737 ¶¶ 17, 25-26.

Getty filed a detailed 800-page prospectus with its Form S-4 on July 1, 2022.  Getty argues that by August 22, 2022, only seven weeks later, the original prospectus was no longer current due to several post-effective developments that materially altered the information disclosed in the original prospectus.[6]  We disagree.

Once a prospectus has been filed, the issuer must disclose any "[p]ost-effective developments which materially alter the picture presented in the

---

[6]     Significantly, there is no evidence in the record that Getty ever contemporaneously raised the prospectus condition as a reason for denying the exercise of the warrant shares.

23

registration statement . . . ." *SEC v. Manor Nursing Ctrs., Inc.*, 458 F.2d 1082, 1095 (2d Cir. 1972), *abrogated on other grounds by*, *Liu v. SEC*, 591 U.S. 71 (2020). Omitted information is only material, however, "when there is 'a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available.'" *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 38 (2011) (quoting *Basic Inc. v. Levinson*, 485 U.S. 224, 231-32 (1988)).  Courts have been "'careful not to set too low a standard of materiality,' for fear that management would 'bury the shareholders in an avalanche of trivial information.'" *Id.* (quoting *Basic*, 485 U.S. at 231).

The district court found that Getty's original S-4 prospectus "had already provided voluminous pro forma financials, extensive information on Getty's post-closing capital structure, and the maximum proceeds Getty could receive from warrant exercise." *Alta Partners*, 700 F. Supp. 3d at 44 (internal quotation marks and citation omitted).  Getty does not challenge this indisputable fact on appeal.

Instead, Getty asserts that the S-1 prospectus disclosed new material information that could not have been included in the Form S-4.  Specifically, the

24

S-1 prospectus (1) disclosed that 99.4% of CCNB shareholders had their CCNB shares redeemed for cash ahead of the merger, (2) provided financial statements about the impact of the redemption rates on changes to Getty's capital structure, (3) added an additional quarter of financial statements through June 2022 ("Q2 2022 statements"), and (4) included updated information about the tax consequences of buying, owning, or selling Getty shares and warrants. In the proceedings below, Getty stated in conclusory fashion that this information was "material" but failed to explain why a reasonable investor would find this information to have significantly altered the total mix of information already available. Nor did Getty point to evidence in the record supporting its materiality. *See CRCM Action*, No. 23-cv-1074-JSR, Dkt. No. 29 at 15-16, Dkt. No. 37 at 15; *accord Alta Action*, *No.* 22-cv-8916-JSR, Dkt. 51 at 14-15, 62 at 12-13. The district court correctly ruled that Getty failed to identify a genuine issue of fact as to the materiality of the disclosures. *See Davis v. New York*, 316 F.3d 93, 100 (2d Cir. 2002) ("[R]eliance upon conclusory statements or mere allegations is not sufficient to defeat a summary judgment motion.").

In fact, none of the purportedly "new" disclosures in the S-1 prospectus could have "altered the total mix of information available" to

25

investors because investors already had access to this information. The "total mix of information" not only encompassed the information in the original prospectus, but also information that was "already in the public domain and facts known or reasonably available to the shareholders." *Rodman v. Grant Found.*, 608 F.2d 64, 70 (2d Cir. 1979); *see also Press v. Quick & Reilly, Inc.*, 218 F.3d 121, 130 (2d Cir. 2000) ("The total mix of information may include data sent to shareholders by a company in addition to its proxy materials, as well as other information 'reasonably available to the shareholders.'" (quoting *United Paperworkers Int'l Union v. Int'l Paper Co.*, 985 F.2d 1190, 1198 (2d Cir. 1993)).

It is undisputed that the S-4 prospectus had already informed investors about the financial impact of redemptions on Getty's company's capital structure in a range of scenarios, and Getty did in fact disclose the 99.4% cash redemption rate to investors in its Form 8-K shortly after the merger, on July 28, 2022. Indeed, Getty itself argues that its own stock price was inflated in the month following the merger precisely *because of* widespread knowledge of the 99.4% redemption rate. *See* Appellant Br. at 55 (noting stock price skyrocketed in the days following news of Getty's "low float"); *id.* at 71 (market commentary attributing the surge in Getty stock price to public speculation over a short

26

squeeze); *accord* Appellant Reply at 26 (observing that the "price of Getty Images shares more than doubled" the morning after the Form 8-K disclosure). Likewise, Getty publicly disclosed the Q2 2022 statements on a Form 10-Q on August 12, 2022, making this additional quarter of financial statements readily available to investors as well.

Finally, CCNB made the same disclosures regarding the tax consequences of buying, owning, and selling the underlying warrant shares in its Form S-1 two years earlier.[7] And even if this tax information was "new," Getty does not explain how it meaningfully altered the total mix of information available to investors or rendered the Form S-4 misleading. The tax effect information was a general "summary of certain U.S. federal income tax considerations" based on existing federal tax law. And the prospectus provided a disclaimer that "urged" each prospective investor "to consult its own tax advisor with respect to the particular tax consequences to such investor." App'x

---

[7]     Both the 2020 and 2022 Form S-1s disclosed to investors that "a U.S. Holder generally will not recognize gain or loss upon the acquisition of our Class A Common Stock ordinary share upon exercise of a [w]arrant for cash. The U.S. Holder's tax basis in the share of our Class A Common Stock received upon exercise of the [w]arrants generally will be an amount equal to the sum of the U.S. Holder's initial investment in the [w]arrants and the exercise price." App'x at 1664 (2022 Form S-1); *see also id.* at 2781 (2020 Form S-1).

at 1663 (2022 Form S-1 Prospectus). "[A]ny new piece of information will, by definition, change the total mix of information available, but that does not automatically make it material." *Rice v. Intercept Pharms., Inc.*, No. 21-CV-0036, 2022 WL 837114, at *10 (S.D.N.Y. Mar. 21, 2022) (alterations adopted) (internal quotation marks and citation omitted).

The dissent argues that the term "current" should be read only to mean "up to date." Dissent at 2. Thus, even if any of the above information was already available to investors, the dissent contends, the prospectus could not have been "current" unless it too contained that information. *Id.* The concept of a "current prospectus," however, has a widely accepted technical meaning in the securities context. Under New York law, "where a word has attained the status of a term of art and is used in a technical context . . . , the technical meaning is preferred over the common or ordinary meaning." *Madison Ave. Leasehold, LLC v. Madison Bentley Assocs. LLC*, 811 N.Y.S.2d 47, 52 (2006), *aff'd*, 8 N.Y.3d 59 (2006); *accord Landmark Ventures, Inc. v. H5 Techs., Inc.*, 58 N.Y.S.3d 591, 593 (2017). Therefore, as we have explained, and as *all parties on appeal agree*, *see* Appellant Br. at 37-38, Appellee Br. at 42-43, Cross-Appellant Br. at 41, a prospectus is not current only if it omits material changes. A change is "material" only if it "would

have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *Matrixx*, 563 U.S. at 38; Appellant Br. at 38. And the total mix of information includes not only what is in the proxy materials, but also "*other* information reasonably available to shareholders." *Press*, 218 F.3d at 130 (emphasis added). Under the dissent's interpretation of the term "current," any post-effective developments, even non-material ones, would render the prospectus out-of-date under the Warrant Agreement. We do not think that such a reading would be consistent with the parties' reasonable expectations. *Landmark*, 58 N.Y.S.3d at 593 ("A court's fundamental objective in interpreting a contract is to determine the parties' intent from the language employed and to fulfill their reasonable expectations."). In any event, the dissent does not challenge our independent and sufficient basis for affirmance -- Getty's failure to marshal any evidence in the record at summary judgment to support its assertion that the new information contained in the S-1 prospectus was material. *See supra* p. 26. For all these reasons, the district court did not err in ruling that the information omitted from the S-4 prospectus was immaterial as a matter of law.

In short, we conclude, as the district court did, that the two conditions for Getty's performance were satisfied on the dates that CRCM and Alta attempted to exercise their warrants in exchange for Getty shares -- there was an "effective" registration statement "with respect to" the "warrant shares underlying the warrants" and a "current" prospectus "relating to" the shares as well. Getty's refusal to deliver the warrant shares therefore was a breach of the Warrant Agreement.

### c. *Damages*

Getty separately argues as to damages that summary judgment was improper because there were genuine factual disputes regarding the market price of the warrant shares. At summary judgment, Getty proffered expert testimony that suggested Getty's stock price on the date(s) of its breach was inflated because of a "rumored short squeeze." App'x at 383. In brief, when 99.4% of CCNB shareholders had their CCNB shares redeemed for cash, rather than exchanged for Getty shares during the merger, only 508,311 shares (0.2%) remained in the "public float." *Id.* at 376. According to Getty's expert, as short sellers received news of the "limited float," they attempted to "'cover' their short positions" by buying more Getty stock, increasing the price further (the "short

30

squeeze"). *Id.* at 383 n.48, 385. Had Alta and CRCM been permitted to exercise their warrants when they wanted to, millions of additional shares would have entered Getty's float, causing the share price to fall below the warrant exercise price of $11.50. Accepting this as true would mean that Alta and CRCM did not suffer any damages from their inability to exercise their warrants.

The district court disagreed. It ruled, based on New York contract law, that the proper valuation for the warrant shares was the trading price on the dates of Getty's breach -- thus, it concluded that any evidence related to the rumored short squeeze was immaterial to the damages calculation. It held that CRCM was entitled to $50,967,348 and Alta to $36,946,713 in damages for Getty's breach. We discern no error in the district court's methodology and therefore reject Getty's argument.

We review the district court's method of calculating damages *de novo*. *See Oscar Gruss & Son, Inc. v. Hollander*, 337 F.3d 186, 196 (2d Cir. 2003).[8] It

---

[8] Although Getty frames its challenge as a factual dispute over the amount of damages, Getty does not actually dispute the accuracy of the calculation. Instead, the dispute really centers on the proper method for valuing the warrants on the date of breach. Therefore, it is a question of law, which we review *de novo*. *See Oscar Gruss*, 337 F.3d at 196 ("Although the amount of recoverable damages is a question of fact, the measure of damages upon which the factual computation is based is a question of law." (quoting *Wolff & Munier, Inc. v. Whiting-Turner Contracting Co.*, 946 F.2d 1003, 1009 (2d Cir. 1991)).

is "fundamental" under New York law, *Sharma v. Skaarup Ship Mgmt. Corp.*, 916 F.2d 820, 825 (2d Cir. 1990), that "damages for breach of contract should put the plaintiff in the same economic position he would have occupied had the breaching party performed the contract," *Oscar Gruss*, 337 F.3d at 196. Along these lines, "a non-breaching party is entitled, as a matter of law, to recover market value damages to the extent that they can be proven with reasonable certainty." *Process Am., Inc. v. Cynergy Holdings, LLC*, 839 F.3d 125, 141 (2d Cir. 2016) (internal quotation marks and citation omitted). We have explained, however, that where "the non-breaching party has proven the *fact* of damages by a preponderance of the evidence, the burden of uncertainty as to the amount of damage is upon the wrongdoer." *Id.* (citation omitted).

It is also a "fundamental proposition" under New York law "that the loss caused by a breach is determined as of the time of breach." *Sharma*, 916 F.2d at 825 (collecting cases); *accord Simon v. Electrospace Corp.*, 28 N.Y.2d 136, 145 (1971). "[W]here the breach involves the deprivation of an item with a determinable market value, the market value at the time of the breach is the measure of damages." *Id.* (citing *Simon*, 28 N.Y.2d at 145-46). For publicly traded stocks, like the warrant shares here, the market value is "the mean between the

32

highest and lowest quoted selling prices, as provided by the public exchange upon which the stock traded" at the time of the breach. *Boyce v. Soundview Tech. Grp., Inc.*, 464 F.3d 376, 385 (2d Cir. 2006).

The district court's method of calculating damages was in accordance with this well-established New York law. The court properly valued the warrant shares based on the dates of Getty's breach, August 22 and 23, 2022 with respect to CRCM, and August 24, 2022 with respect to Alta. It then calculated the damages by comparing the warrant strike price, $11.50 per warrant, with the mean stock trading price of the Getty shares on those dates and multiplied that figure by the number of warrants that Alta and CRCM would have exercised but for Getty's breach. *See Oscar Gruss*, 337 F.3d at 197 ("Based on clear New York law, the proper valuation for the warrants was the date of the breach -- the date [defendant] failed to deliver the warrants."); *Simon*, 28 N.Y.2d at 145 ("The proper measure of damages for breach of contract is determined by the loss sustained or gain prevented at the time and place of breach . . . [t]he rule is precisely the same when the breach of contract is nondelivery of shares of stock.").

33

In urging otherwise, Getty argues that "the value of a security may not be equivalent to its market price," *McMahan & Co. v. Wherehouse Ent., Inc.*, 65 F.3d 1044, 1048 (2d Cir. 1995), and courts should accordingly adjust the value of stock to account for such situations. The rule we described in *McMahan*, however, was based on Congress's use of the term "value" within the Securities Act. *See id. at* 1048-49. We explained that "Congress' use of the term 'value,' [in the context of the Securities Act] as distinguished from the terms 'amount paid' and 'price' indicates that, under certain circumstances, the market price may not adequately reflect the security's value." *Id.* We decline to extend this rule to a common law breach of contract action, especially given the clear New York law to the contrary. *See Sharma*, 916 F.2d at 825 (explaining that New York courts "have rejected awards based on what the actual economic conditions and performance were in light of hindsight." (internal quotation marks omitted)).

We conclude that CRCM and Alta carried their burden at summary judgment by establishing the amount of damages with reasonable certainty at the time of breach and Getty failed to identify any genuine issue of material fact.[9]

---

[9]     Getty relies on *Cottam v. 6D Global Technologies, Inc.*, No. 21-1031, 2022 WL 16908708 (2d Cir. Nov. 14, 2022) (summary order), a non-precedential summary order in which we held that the plaintiff had failed to provide a reasonable estimate of

Because the proper valuation for the warrant shares was the undisputed mean market price on the date of breach, any remaining speculation about the existence of a short squeeze or the value of the stock absent a short squeeze was irrelevant and therefore immaterial. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The district court correctly granted summary judgment as to the amount of damages.

## II. *Alta's Cross-Appeal*

Alta makes two principal arguments in its cross-appeal. First, Alta argues that it is entitled to $195 million in damages for claims that it "automatically" acquired when it bought warrants from *other warrant holders* after August 24, 2022 -- the date of Getty's original breach with respect to Alta. Alta also contends that it is entitled to $9.2 million in damages for the 1,147,714 warrants it directly purchased from Getty between August 25, 2022 and September 6, 2022. For the reasons that follow, neither argument is persuasive.

---

damages because he did not account for the dilution of the stock price. *Cottam* lacks persuasive value because it dealt with the valuation of restricted stocks that were not publicly traded. *Id.* at 2. The instant appeal, by contrast, involves the value of publicly traded stocks and the rule for valuation of publicly traded stocks is well-settled. *See Boyce*, 464 F.3d at 385 (explaining the different methodologies for valuing publicly traded versus non-publicly traded stock).

a. *Purchases from Prior Warrant Holders*

Between August 25 and September 6, 2022, Alta purchased millions of warrants through the NYSE from other warrant holders. Alta asserts that it "stepped into the shoes" of these prior warrant holders and "acquired their claims against Getty for breach of contract." Cross-Appellant Br. at 61. Accordingly, Alta argues that it is entitled to damages for breach of contract claims that accrued to these warrant holders.

The parties initially dispute whether, under New York law, Alta could legally acquire breach of contract claims against Getty from other warrant holders without an express assignment of those claims. In the proceedings below, the district court assumed without deciding that Alta *could* acquire the claims but nonetheless rejected Alta's request for additional damages because it found no evidence that any of the prior warrant holders "performed (or would have performed) under the Warrant Agreement." Special App'x 25-26 (internal quotation marks omitted). We agree and affirm on these grounds.

Alta concedes that "performance of the contract" is an essential element of its claim, *First Invs. Corp. v. Liberty Mut. Ins. Co.*, 152 F.3d 162, 168 (2d Cir. 1998), but maintains that it should be excused from proving that the other

36

warrant holders performed.  Citing the doctrine of anticipatory breach, Alta

argues that "a wrongful repudiation of the contract by one party before the time

of performance entitles the non-repudiating party to immediately claim damages

for total breach, and will relieve the non-repudiating party of its obligations of

future performance." *Aetna Cas. & Sur. Co. v. Aniero Concrete Co.*, 404 F.3d 566,

587 (2d Cir. 2005) (per curiam) (internal quotation marks omitted).  Relief from

future performance, however, does not mean relief from proof of the *ability* to

perform.

Even if we assume that Getty repudiated the Warrant Agreement

with respect to the prior warrant holders, New York courts are clear that the non-

repudiating counterparty must still show that it "was ready, willing, and able to

perform its own obligations under the contract when performance was due."

*Towers Charter & Marine Corp. v. Cadillac Ins. Co.*, 894 F.2d 516, 523 (2d Cir. 1990)

(applying New York law); *Pesa v. Yoma Dev. Grp., Inc.*, 18 N.Y.3d 527, 532 (2012)

("The rule requiring non-repudiating buyers to show their readiness, willingness

and ability to perform is supported by common sense.  It is axiomatic that

damages for breach of contract are not recoverable where they were not actually

caused by the breach -- i.e., where the transaction would have failed, and the

37

damage would have been suffered, even if no breach occurred.").  The New York Court of Appeals teaches that this allocation of proof is "reasonable" because buyers "can more readily produce evidence of their own intentions and resources."  *Pesa*, 18 N.Y.3d at 532.

Alta fails to make this necessary showing because it does not know the identity of any of the prior warrant holders, let alone whether they were "ready, willing, and able to close" the transaction.  *Id.* at 531 (internal quotation marks omitted).  Alta points to several email exchanges in which various individual warrant holders inquired about exercising their warrants.  But Alta does not claim that it purchased any of these specific individuals' warrants.[10]

Alta next argues that it should be relieved from producing evidence of the warrant holders' ability to perform.  Alta reasons that it purchased the warrants through an anonymous digital marketplace (the NYSE) and thus cannot discover the prior warrant holders' identities.  In support of its argument, Alta relies on *American List Corp. v. U.S. News & World Report*, 75 N.Y.2d 38 (1999), for the proposition that the non-repudiating party need not prove "its ability to

---

[10]    Getty argues that Alta did not rely on this evidence at summary judgment below. Alta, however, submitted these emails as exhibits to its summary judgment briefing below and so we consider them on appeal.  The emails nonetheless fail to create a genuine dispute of fact for the reasons stated above.

perform the contract in the future." *Id.* at 44. *American List*, however, involved considerably different facts and has been cabined to limited circumstances that are not present here.

In that case, a magazine repudiated its 10-year contract to rent mailing lists from a list supplier less than two years into the contract. *See id.* at 41-42. The New York Court of Appeals later distinguished *American List* by the fact that the non-repudiating party would be faced with a "perhaps impossible burden of showing what its financial condition would have been for many years to come." *Pesa*, 18 N.Y.3d at 533 (affirming the "correct" rule is that the non-repudiating party must prove its ability to perform and distinguishing *American List*); *see also Randolph Equities, LLC v. Carbon Cap., Inc.*, 648 F. Supp. 2d 507, 520 (S.D.N.Y. 2009) ("The holding of *American List* does not apply to this situation and has not been consistently followed by New York courts in analogous cases."). "No comparable burden falls" on Alta here. *Pesa*, 18 N.Y.3d at 533. Unlike the non-repudiating party in *American List*, Alta was not faced with the task of proving the warrant holders' ability to perform years into the future. Rather, Alta was only required to produce evidence that the warrant holders could close a discrete transaction at a single point in time. *See id.* (declining to extend

*American List* because the buyers only needed to show that they "would and could have closed the transaction if the seller had proceeded to a closing as the contract required").

We also think it is significant that the burden placed on the non-repudiating party in *American List* was created through no fault of its own. By contrast, Alta assumed the risk of uncertainty when it continued to purchase warrants from anonymous warrant holders well after Getty announced that it would not permit the exercise of those same warrants on August 24, 2022. Under these circumstances, we will not depart from the well-settled allocation of proof -- that the burden of proving the ability to perform rests with the buyer who is in a better position to "produce evidence of their own intentions and resources." *Id.* at 532.

Accordingly, Alta failed to present evidence showing that "but for the seller's repudiation, the transaction could and would have closed." *Id.* at 531. We conclude as a matter of law that no breach of contract claims passed with the warrants to Alta.

**b.** *Purchases from Getty*

Alta lastly asserts that, at a minimum, it is entitled to recover $9.2 million in damages for the 1,147,714 warrants it purchased directly from Getty after the date of Getty's original breach -- between August 25 and September 6, 2022. Alta argues that the district court treated CRCM and Alta differently because CRCM was able to recover for warrants that it possessed on August 22, 2022, the first date that it attempted to exercise the warrants, and for the 45,623 warrants it purchased the day after, on August 23, 2022.

We reject the argument because Alta failed to mitigate its damages and Alta and CRCM were not in fact treated differently. Under New York law, a plaintiff has a duty to take reasonable steps to mitigate its damages. *See Brushton-Moira Cent. Sch. Dist. v. Fred H. Thomas Assocs., P.C.*, 91 N.Y.2d 256, 262-63 (1998); *Wilmot v. State*, 32 N.Y.2d 164, 168-69 (1973). The district court awarded damages to CRCM for warrants that it already owned on August 22, 2022, as well as additional warrants that it purchased on August 23, 2022. But CRCM's duty to mitigate did not come into play until August 25, 2022, when it was definitively told by Getty that the warrants were not exercisable.

"A duty to mitigate damages arises when (1) a contract is breached and (2) it appears that the breaching party has abandoned or repudiated his obligations under the contract." *U.S. Bank Nat'l Ass'n v. Ables & Hall Builders*, 696 F. Supp. 2d 428, 441 (S.D.N.Y. 2010) (internal quotation marks omitted). On August 22, 2022, a representative from Morgan Stanley (on behalf of CRCM) emailed Getty and American Stock Transfer & Trust ("AST"), the warrant agent and direct counter-party to the Warrant Agreement, to inquire whether the warrants could be redeemed. While AST informed Morgan Stanley that the warrants could not be exercised on August 22, 2022, Getty itself did not respond to Morgan Stanley's August 22 email until August 25, 2022. CRCM's duty to mitigate therefore did not come into play until August 25 and the district court properly awarded CRCM the damages based on the warrants it possessed on August 22 and 23, 2022. By contrast, Alta tried to exercise approximately two million warrants on August 24 and was immediately told by Getty that same day that they were not exercisable. Yet Alta continued to purchase warrants over the next 18 days, until September 6, 2022. Accordingly, Alta is not entitled to additional damages for warrants purchased after Getty communicated its refusal to perform under the contract.

*CONCLUSION*

For the reasons set forth above, we AFFIRM the district court's judgments.

MENASHI, *Circuit Judge*, dissenting:

In my view, Getty has identified a question of material fact as to whether the prospectus was "current" when Alta and CRCM sought to exercise the warrants. J. App'x 26 (§ 3.3.2). For that reason, I would vacate the judgment and remand for further proceedings.

After the business combination, Getty filed a new prospectus with a Form S-1. *See id.* at 1958-2008. That prospectus included an additional quarter of financial statements; information about the updated tax consequences of buying and selling Getty's shares; and pro forma financial statements describing changes to Getty's capital structure. *See id.* at 493-94, 1959-60, 1964-65. The S-1 prospectus also disclosed that 99.4 percent of the shareholders of CCNB had chosen to redeem their shares for cash instead of receiving shares of Getty. *See id.* at 1960. None of this information appeared in the prospectus that Getty previously filed with a Form S-4.

The majority opinion concludes that the S-4 prospectus was nevertheless current because "investors already had access to this information" from disclosures in other public filings. *Ante* at 26. We have explained that an issuer has "committed securities fraud in violation of Rule 10b-5 by failing to disclose," *Press v. Quick & Reilly, Inc.*, 218 F.3d 121, 123 (2d Cir. 2000), if "there is a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the total mix of information made available," *id.* at 130 (internal quotation marks omitted) (quoting *Acito v. IMCERA Grp., Inc.*, 47 F.3d 47, 52 (2d Cir. 1995)). In this context, "[t]he total mix of information may include data sent to shareholders by a company in addition to its proxy materials, as well as other information reasonably available to the shareholders." *Id.* (internal quotation marks omitted) (quoting *United*

*Paperworkers Int'l Union v. Int'l Paper Co.*, 985 F.2d 1190, 1198 (2d Cir. 1993)). Thus, in securities fraud cases we take "into account information already in the public domain and facts known or reasonably available to the shareholders." *Rodman v. Grant Found.*, 608 F.2d 64, 70 (2d Cir. 1979).

This appeal, however, concerns a purported breach of contract rather than securities fraud. "When ascertaining the meaning of contractual language," we give the words of the contract "their plain meaning." *Glob. Reinsurance Corp. of Am. v. Century Indem. Co.*, 22 F.4th 83, 95 (2d Cir. 2021). Instead of interpreting "current" to mean up to date, the majority opinion concludes that "current" means sufficient to avoid liability for securities fraud under Rule 10b-5. *See ante* at 23-24 (quoting *SEC v. Manor Nursing Ctrs., Inc.*, 458 F.2d 1082, 1095 (2d Cir. 1972)). But the fact that information in the S-1 prospectus was publicly available—yet did not appear in the S-4 prospectus—shows that the S-4 prospectus was not up to date.

The majority insists that its understanding reflects the "technical meaning" of the "concept of a 'current prospectus.'" *Ante* at 28. But that is incorrect. An issuer must file "[a] form of prospectus that reflects facts or events … that constitute a substantive change from or addition to the information set forth in the last form of prospectus filed with the [Securities and Exchange] Commission." 17 C.F.R. § 230.424(b)(3). The securities laws "require the prospectus to reflect any post-effective changes necessary to keep the prospectus from being misleading in any material respect." *Manor Nursing Ctrs.*, 458 F.2d at 1096 (quoting *SEC v. Bangor Punta Corp.*, 331 F. Supp. 1154, 1160 n.10 (S.D.N.Y. 1971)). The availability of information in the public domain does not excuse an issuer from that obligation. The applicable "case law does not support the sweeping proposition that an issuer of securities is never required to disclose publicly available

information." *Litwin v. Blackstone Grp., L.P.*, 634 F.3d 706, 718 (2d Cir. 2011); *see Kronfeld v. TWA, Inc.*, 832 F.2d 726, 736 (2d Cir. 1987) ("There are serious limitations on a corporation's ability to charge its stockholders with knowledge of information omitted from a document such as a … prospectus on the basis that the information is public knowledge and otherwise available to them."); *Kapps v. Torch Offshore, Inc.*, 379 F.3d 207, 213 (5th Cir. 2004) ("[T]he definition of 'material' … is not strictly limited to information that is firm-specific and non-public.").[1] Even when "the relevant information was public knowledge," it does not follow that it "could not be material because it was already part of the 'total mix' of information available to investors." *Litwin*, 634 F.3d at 718. The securities laws are "violated if the prospectus omitted to state a material fact *required to be stated therein*." *Kapps*, 379 F.3d at 217 (emphasis added) (internal quotation marks omitted).[2]

---

[1] *See also United Paperworkers Int'l Union v. Int'l Paper Co.*, 985 F.2d 1190, 1199 (2d Cir. 1993) (noting that "when the subject of a proxy solicitation has been widely reported in readily available media, shareholders may be deemed to have constructive notice of the facts reported, and the court may take this into consideration in determining whether representations in or omissions from the proxy statement are materially misleading" but that "sporadic news reports do[] not give shareholders sufficient notice that proxy solicitation statements sent directly to them by the company may be misleading, and such reports should not be considered to be part of the total mix of information that would clarify or place in proper context the company's representations in its proxy materials").

[2] *See also Krim v. BancTexas Grp., Inc.*, 989 F.2d 1435, 1445 (5th Cir. 1993) (considering whether "the information allegedly omitted or misrepresented in the prospectus was material, in the sense that it would have altered the way a reasonable investor would have perceived the total mix of information available *in the prospectus* as a whole") (emphasis added).

In this case, the appellees acknowledge the possibility that "the Form S-4 prospectus ceased being current prior to August 24, 2022," Alta Br. 49, but argue that "Getty could have easily updated the S-4 prospectus by August 22, 2022 by filing one or more 'prospectus supplements,'" which are "historically referred to as 'stickers,'" CRCM Br. 49; *see also* Alta Br. 46 ("Had Getty believed it needed to disclose material changes to its condition after July 1, 2022, it could have efficiently done so by filing a prospectus supplement. Rule 424(b)(3) permits an issuer to supplement a prospectus through a 'sticker' as a simple means to reflect 'a substantive change from or addition to the information set forth in the last form of prospectus.'") (quoting 17 C.F.R. § 230.424(b)(3)).

Getty argues that it could not have used a sticker because the post-effective changes were "fundamental," 17 C.F.R. § 229.512(a)(1)(ii), and otherwise could not have been "accurately and succinctly stated in a short sticker," *Delayed or Continuous Offering and Sale of Securities*, 46 Fed. Reg. 42001, 42007 (Aug. 18, 1981). Regardless of that dispute, to establish a breach of contract, the appellees needed to show not only that a sticker was permissible but that a post-effective amendment was outside the bounds of "commercially reasonable efforts" so as to violate the contract. J. App'x 33 (§ 7.4.1). Because the appellees did not do so beyond any genuine dispute of material fact, I dissent.